IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ANTHONY JOSEPH, | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civ. A. No. 19-933 |
| | ) |
| WEST PENN ALLEGHENY HEALTH SYSTEM, INC. d/b/a ALLEGHENY GENERAL HOSPITAL, | ) |
| Defendant. | ) |

**MEMORANDUM OPINION**[1]

Plaintiff Anthony Joseph ("Joseph") commenced this employment discrimination action against Defendant West Penn Allegheny Health System, Inc. d/b/a Allegheny General Hospital ("AGH") under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Stat. and Con. Stat. Ann. § 951 *et seq.* Joseph, who has a degenerative condition that effects his speech, alleges that his former supervisor at AGH, Ramadevi Kalla ("Kalla"), subjected him to a disability-based hostile work environment for nearly four years.

Presently before the Court is AGH's motion for summary judgment that has been fully briefed.

**I.   Relevant Procedural History**

Joseph commenced this action in July 2019. (ECF No. 1.) Four stays were jointly sought and granted based on the parties' assertions that the COVID-19 pandemic had limited their ability to conduct discovery. (ECF Nos. 23, 26; 29; 32.) After the final stay was lifted in November 2020

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c)(1), the parties have voluntarily consented to have a United States Magistrate Judge conduct proceedings in this case. Thus, the undersigned has the authority to decide dispositive motions and enter final judgment.

1

(ECF No. 32), fact discovery was completed on March 31, 2021, and a schedule for dispositive motions was then issued.

AGH filed a motion for summary judgment, a brief in support, a concise statement of material facts, and supporting exhibits on June 30, 2021. (ECF Nos. 45-48.) Joseph subsequently filed a response in opposition as well as a responsive concise statement of material facts, an additional concise statement of material facts, and supporting exhibits. (ECF Nos. 49-52.) AGH then filed a reply brief, a response to Joseph's additional facts, and a supplemental exhibit. (ECF Nos. 55-57.)

## II.     Factual Background

Joseph has spasmodic dysphonia, a degenerative physical impairment that affects his ability to speak. (ECF No. 50 ¶ 1.) Over the years, Joseph's condition has progressively worsened. (ECF No. 48-1 at 7-8.) His condition, which varies from day to day, makes it difficult for people to understand him. (ECF No. 50 ¶ 6.) His difficulties include soundless breaks in his speech. (*Id.* ¶ 4.) Joseph describes his symptoms as episodic and explains that there are times where he struggles to get words and phrases out. (ECF No. 48-1 at 6.) Consequently, he is careful when choosing his words and is frequently asked by his colleagues to repeat himself. (*Id.* at 7-9.)

Joseph began working as an echocardiograph technologist for AGH in 2012. (ECF No. 50 ¶ 9.) As an echocardiograph technologist, he performs echocardiograph tests on patients and enters the results in AGH's database. (ECF No. 47 ¶ 4.) By all accounts, he had no issues at AGH until Kalla became his supervisor in November 2015. (*Id.* ¶ 6; ECF Nos. 48-1; 50 ¶ 11.) Kalla supervised Joseph for nearly four years. (ECF No. 47 ¶ 10.) Kalla, who was born and raised in India, speaks with an accent. (ECF Nos. 52-4 at 7; 52-5 at 21.) She often uses phrases like "Do you understand me" to ensure that she has clearly conveyed her point. (ECF No. 52-4 at 7.) At

times, her employees were unable to understand her, and she had to repeat herself. (ECF No. 48-3 at 8.)

Both Kalla and Joseph agree that their work relationship was strained throughout her time with AGH. A large part of the issues between them was that neither could agree on how best to run the scheduling committee. (ECF Nos. 48-1 at 41-45;48-3 at 9; 48-4 at 7.) Additionally, Kalla perceived Joseph as disrespectful and insubordinate. (ECF Nos. 48-1 at 24; 52-27; 52-28.) Joseph, in turn, believed Kalla was harassing him because of his disability.

Joseph was the only echocardiograph technician with a speech impediment in the department who worked with Kalla. (ECF No. 47 ¶ 51.) Joseph asserts that he shared with her that he had a speech impediment during one of their first meetings. (ECF No. 50 ¶ 15.) While AGH asserts that Kalla did not consider Joseph to have problems with his speech pattern, it acknowledges that his "speech differences are noticeable to some people." (*Id.* ¶ 8).

Joseph testified that Kalla's discrimination was ongoing and was especially prevalent when he worked with her and Alan Matthews ("Matthews"), who is also an echocardiograph technologist, as part of a three-person scheduling committee. (ECF No. 47 ¶ 59.) Joseph explained that during those meetings,

> when we were talking, or discussing issues with the scheduling committee, [Matthews] would talk, she would listen to him. When I would talk, she would cut me off, or interrupt me, or mock me and make a face. Or put her hand in my face and say I'm not -- I can't communicate with you.[2]

---

[2] It is unclear from Joseph's transcript whether this event happened on multiple occasions or whether he is repeating the same story after being asked for specific examples. (ECF No. 52-6 at 23-31.)

(ECF No. 48-1 at 31.)  Given the host of issues surrounding the scheduling committee, it was ultimately disbanded, although the record does not reflect when this occurred.  (ECF No. 47 ¶ 130.)

According to Joseph, Kalla's behavior occurred "all the time" during the nearly four-year period that she was his supervisor, including during formal meetings, informal conversations, and group huddles of staff members.[3]  (ECF No. 50 ¶¶ 48, 64.)  At times, she would put her hand up to his face when telling him she could not or would not communicate with him.  (*Id.* ¶ 58.)  She would "get so mad" when she had to talk with him, couldn't stand talking to him and stated that she could talk to Matthews and not him.  (*Id.* ¶ 57.)  When asked, "[h]ow many times during the three and a half years that you and Ms. Kalla worked together did she cut you off," Joseph responded, "I have no idea the number of times.  That would be a guess.  But it never ceased."  (ECF No. 52-6 at 33.)

Asked during his deposition to provide specific examples of Kalla's discriminatory behavior, Joseph described four events in which Kalla went out of her way to make him feel inferior, "as if [he] was some kind of child or retarded being that didn't know what was being said."[4]  (ECF No. 52-6 at 25.)  On his second day working with her, during a get-to-know each other meeting, Kalla squinted and puckered her lips "as if [he] was some foreigner, or some foreign alien."  (*Id.* at 26.)  At some point during this meeting, while Joseph was still talking, Kalla turned to face her computer and began to type.  (*Id.* at 27.)  Joseph stopped her from typing and asked, "Are you busy or what," to which Kalla responded that the meeting was over.  (*Id.*)

---

[3] A huddle is an "opportunity for the manager to communicate, around five minutes, any information [the manager] might need to know for the day, you know, maybe for the week."  (*Id.* at 9.)

[4] Co-worker Amy Garcia similarly testified that Kalla treated Joseph like a child.  (ECF No. 52-5 at 11.)

In April 2016, Kalla called Joseph into her office to explain that she was unable to accommodate his vacation request because doing so would leave AGH short staffed. (*Id.*) When Joseph began arguing with her noting that "I had that scheduled long before you were hired" and "[y]ou can't take my vacation away because of a staffing issue," Kalla walked over to the calendar, stooped down, pointed at it, and ask Joseph whether he could read. (*Id.*; ECF No. 50 ¶ 19.) She continued, "If you [could], you'd understand what I'm saying[, a]nd I don't think you understand." (ECF No. 52-6 at 27-28.) Joseph retorted that AGH has a mutual respect policy and Kalla should not be speaking to him like that. (*Id.* at 28.) Nevertheless, smirking, Kalla repeated the question to which Joseph responded that his speech was a result of an automobile accident and not a sign of his intelligence. (*Id.*; ECF No. 50 ¶ 20.)

In early 2017, a department-wide meeting was held to discuss problem solving skills. (ECF Nos. 50 ¶ 60; 52-6 at 28-29; 52-8 ¶ 16e.) The meeting was led by Sue Baker, who was a "Lean Coach." (ECF No. 50 ¶ 60.) During the meeting, a number of employees asked questions and made comments. (*Id.* at 29.) When Joseph tried to speak, Kalla began speaking over him. (ECF No. 50 ¶ 60.) Thereafter, Baker invited Joseph to finish what he was saying, but Joseph declined, responding, "I'd rather not, apparently she wants to talk." (*Id.*)

During another meeting on September 25, 2017, that was attended by Joseph, Kalla, Portia Tranguch ("Tranguch"), the Director of Cardiac Services at Allegheny Health Network, Ben Brewer ("Brewer"), a union representative, and Julie Stuck ("Stuck"), a Human Resources Specialist at AGH, Joseph began to speak and Kalla interrupted him. (ECF Nos. 52-6 at 29; 52-8 ¶ 16a.) Stuck noticed and asked Joseph to finish his thought. (ECF No. 52-6 at 29.) However, Joseph declined uttering, "[N]o, I'm used to it. This is an ongoing thing." (*Id.*)

5

On October 23, 2017, a scheduling meeting was held in Kalla's office which Joseph and Matthews attended. After Kalla's phone began to ring, she answered the call and turned her back to Joseph. (ECF No. 52-6 at 31.) Upon concluding her call, she turned back around and asked why Joseph was staring at her. (*Id.*) Joseph responded, "I'm here to meet with you. I'm just sitting here facing that way. What do you want me to do?" (*Id.*) It is unclear from the record how Kalla responded. During this meeting, however, only Matthews and Kalla spoke. (*Id.*)

The Complaint filed by Joseph with the Equal Employment Opportunity Commission ("EEOC") describes two events. (ECF No. 52-8.) During an October 2017 scheduling meeting, Kalla allowed Matthews to speak and when he finished, Joseph started speaking.[5] (*Id.* ¶ 16d.) Before Joseph could finish, Kalla began talking over him. (*Id.*) Noticing he had been interrupted, Matthews inquired whether Joseph wanted to finish. (*Id.*) It is unclear whether Joseph chose to do so.

Also referenced in the EEOC Complaint is a November 2017 meeting concerning AGH's new time-documenting rules. (*Id.* ¶ 16f.) Although other employees were permitted to ask questions and to provide Kalla with feedback, Joseph was unable to do so, and Kalla would cut him off every time he tried to contribute. (*Id.*) In response, Joseph stated "how do you have any idea what I [am] going to suggest when you cut me off right away?" (*Id.*) Kalla then offered to allow him to finish but Joseph was too humiliated and upset to do so. (*Id.*)

Joseph's coworkers described Kalla as talking to him as though to belittle him, deliberately slowing her voice, and confirmed that she would not allow him to speak. (ECF No. 50 ¶¶ 51-52.) They were embarrassed for Joseph because of the way Kalla treated him. (*Id.* ¶ 53.) Matthews

---

[5] It is unclear whether this was during the same October 2017 meeting as the telephone incident described previously.

testified during his deposition that Kalla regularly cut Joseph off during their periodic scheduling committee meetings. (ECF No. 52-7 at 8.) Matthews had also seen Kalla make faces at Joseph and heard her tell Joseph that she could not understand him. (*Id.* at 1-13.) When asked to provide examples of insensitive things Kalla would say to Joseph, Matthews offered:

> I believe [Joseph] said something to the effect of, you know, you're not listening, or you're not giving us a chance to explain ourselves. And she said -- she interrupted him and said I can't understand you. I cannot talk to you. And she put her hands up and pointed towards me, and said, now, [Matthews], I can understand him. I can talk to [Matthews].

(*Id.* at 6.) When asked if this happened more than once, Matthews responded, "[i]t's possible." (*Id.* at 7.) Asked how Kalla treated Joseph differently than others in the department, Matthews explained,

> Well, she would -- she had a tendency to interrupt him before he made his point, or it was understood what he was saying. And I did not observe that with other people. And she seemed to have kind of less of a patience with him when he was trying to explain things.

(*Id.* at 11.) Matthews likewise could recall Kalla interrupting Joseph in a huddle. (*Id.* at 9, 11, 15.)

Matthews also saw that Kalla was frustrated with Joseph and would say things that were "quite insensitive." (ECF No. 50 ¶ 40.) Kalla would put her hand up to Joseph's face to stop him from speaking and say that she preferred to communicate with Matthews. (*Id.* ¶ 45.) While acknowledging that he felt at times that Kalla did not respect him, Matthews stated that she did not treat him as badly as she behaved toward Joseph; she did not interrupt him or stop him from speaking. She did not put her hand up to stop him from speaking and he never saw her do that to anyone other than Joseph. (*Id.* ¶ 75.)

Another co-worker, Amy Garcia, testified that it was not uncommon for Kalla to interrupt or belittle other technicians. (ECF No. 48-4 at 9.) When asked whether Kalla treated all

technicians the same, Garcia explained that unlike Joseph's peers, Kalla's interactions with Joseph included slowing her voice down, puckering her lips, and squinting at him. (*Id.* at 15, 26.) Garcia also offered an example where Kalla cut Joseph off and said, "I don't even understand what you're saying or I don't know what you mean." (ECF No. 52-5 at 5.) While Garcia also had issues with Kalla's management style, she testified that Kalla's conduct was "more prevalent" with Joseph and that others did not experience poor treatment "to the extreme" as Joseph. (ECF No. 50 ¶ 69.) Garcia describes Kalla as acting like she could not understand Joseph and slowing her voice down as though he was a little child, to belittle and disrespect him. (ECF No. 52-5 at 30-32, 33-34).

While Joseph was working with Kalla, he complained both to union representatives and AGH employees that Kalla was discriminating against him. For example, after Kalla asked him whether he knew how to read, Joseph contacted his union representative, Brewer, and informed him that he wanted to file a grievance against Kalla. (ECF No. 52-6 at 1-2.) Brewer encouraged him to contact Human Resources first. (*Id.*) Instead, Joseph spoke to Kalla's supervisor.

On May 4, 2016, Tranguch, Kalla, and Joseph met to discuss the ongoing issues between Kalla and Joseph. (ECF No. 52-3 at 7-10.) During the meeting, Joseph criticized Kalla for her demeaning tone when speaking to him, regularly interrupting him, and making faces at him. (ECF No. 52-4 at 2-4.) Towards the conclusion of the meeting, Tranguch acknowledged that, at times, both of them can be difficult to understand and urged them "to work together . . . and to help each other understand instead of assuming what the other person has said." (ECF No. 52-3 at 9-10.)

Dissatisfied with the outcome of the meeting, Joseph sought help from his union. (ECF No. 50 ¶ 26.) Around the same time Kalla complained to Tranguch about Joseph's behavior because of her view that he was disrespectful to her and refused to follow her instructions. (ECF No. 47 ¶ 127.) Eventually, Joseph, the union, and Senior Human Resources Specialist, Kelly

Crawford, met in June 2016.  (*Id.* ¶ 27.)  Crawford promised Joseph she would look into the matter, but Joseph never heard anything further from her.  (*Id.* ¶ 28.)  However, Kalla recalls meeting with Crawford and being told that Joseph had complained that she spoke differently to him and targeted him.  (ECF No. 50 ¶ 32.)  In November 2016, Joseph contacted Janelle Taylor, a Human Resources Specialist, to complain about Kalla's ongoing disability-based harassment, but she did not respond to his email.  (ECF No. 52-6 at 54.)  On January 2, 2018, Joseph emailed his concerns about Kalla to Stuck and then met with Stuck.  (ECF No. 50 ¶ 82.)  He also filed a Charge of Discrimination with the EEOC.  (*Id.* ¶ 83.)

Joseph was not the only employee to complain to Human Resources about Kalla's behavior although he was the only one who had a speech impairment.  (*See* ECF No. 48-1 at 24.)  Joseph was also not the only one to be interrupted or talked over by Kalla or to experience her annoyed facial expressions.  (ECF Nos. 52-1 at 32; 52-5 at 5-15.)  Even Stuck was on the receiving end of Kalla's facial expressions, intentional heavy breathing, and interruptions.  (ECF No. 48-6 at 5.)

Kalla's visible impatience was not her subordinates' only issue with her leadership style.  Joseph explained that it was widely agreed that she was a poor manager because "[s]he created an extremely hostile, toxic work environment.  She ruled by intimidation.  She was unapproachable.  If you disagreed with her, she viewed it as being attacked, other than having a difference of opinion.  She was vindictive to a lot of employees."  (ECF No. 48-1 at 24; *see* ECF No. 47 ¶ 51.)  Joseph's coworkers testified similarly.  (ECF Nos. 47 ¶¶ 51, 52; 52-7 at 11-12.)  Accordingly, it was widely agreed that Kalla was a micro manager, played favorites, and could be abrupt and even vindictive.  (ECF No. 50 ¶ 12.)

In January 2018, AGH issued a warning to Kalla and placed her on a Personal Improvement Plan after Millie Owens, another employee, complained about Kalla's communication style.  (ECF

Nos. 47 ¶ 131; 50 ¶¶ 88-90; 52-3 at 24.)  Kalla was warned that failure to satisfy the program's requirements would result in further disciplinary action up to and including termination.  (ECF No. 52-17 at 2.)  As part of the improvement plan, Tranguch instructed Kalla that she should strive to be more clear and more compassionate with her staff, engage in regular conversations with her staff and become a better communicator.  (ECF No. 47 ¶ 132.)  Kalla was assigned to read *6 Shortcuts to Employee Engagement* and was coached on effective communication, how to better "celebrate WOWs" with her staff, and how to include her staff in decision making.  (ECF No. 50 ¶ 91.)  Nothing in the written warning, the performance improvement plan, the book, or the follow up coaching, specifically addressed discrimination or harassment.  (*Id.* ¶ 92.)  After Kalla completed the plan, Tranguch noted that Kalla displayed markedly improved communication and noticed that she was no longer severely pointed or abrupt when talking to others.  (ECF No. 47 ¶ 134.)

In April 2019, Kalla's position was eliminated as part of a department merger, and her employment with AGH was effectively terminated.  (*Id.* ¶ 135.)  Joseph continues to work for AGH.  (*Id.* ¶ 137.)

### III.   Standard of Review

The Federal Rules of Civil Procedure provide that summary judgment must be granted if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The moving party bears the initial burden of identifying evidence which shows the lack of a genuine issue of material fact.  *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S.

574, 587 (1986). Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Id.* (internal citation omitted). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court of Appeals has held that "where the movant bears the burden of proof at trial and the motion does not establish the absence of a genuine factual issue, the district court should deny summary judgment even if no opposing evidentiary matter is presented." *Nat'l State Bank v. Fed. Rsrv. Bank of New York*, 979 F.2d 1579, 1582 (3d Cir. 1992).

In following this directive, a court must take the facts in the light most favorable to the non-moving party and must draw all reasonable inferences and resolve all doubts in that party's favor. *Hugh v. Butler Cty. Fam. YMCA*, 418 F.3d 265, 267 (3d Cir. 2005); *Doe v. Cty. of Ctr., Pa.*, 242 F.3d 437, 446 (3d Cir. 2001).

**IV.** **Discussion**

Joseph's disability-based hostile work environment claims are asserted under the ADA and PHRA. The legal standard under both statutes is the same. *Perry-Hartman v. Prudential Ins. Co. of Am.*, No. 17-CV-4732, 2021 WL 3077551, at *6 (E.D. Pa. July 20, 2021). To succeed on a hostile work environment claim, the plaintiff must demonstrate that

> (1) he is a qualified individual with a disability; (2) he was subject to unwelcome harassment; (3) the harassment was because of his disability or a request for accommodation; (4) 'the harassment was sufficiently severe or pervasive to alter the conditions of [his] employment and to create an abusive working environment'; and (5) that the [defendant] knew or should have known of the harassment and failed to take prompt and effective remedial action.

*Frost v. City of Phila.*, 839 F. App'x 752, 758 (3d Cir. 2021) (quoting *Walton v. Mental Health Ass'n*, 168 F.3d 661, 667 (3d Cir. 1999)) (first alteration in original).

AGH argues that summary judgment is warranted for three reasons. (ECF No. 46.) First, it asserts, Joseph cannot prove his disability-based harassment claim because Kalla, did not consider Joseph to be disabled and as such, could not have discriminated against him on that basis. (*Id.* at 7-10.) Second, AGH contends that Joseph cannot show that he was treated differently because of his disability because Kalla treated all subordinates, regardless of disability status, equally poorly. (*Id.* at 10-18.) AGH notes that Kalla exhibited the same to negative behavior toward others in Joseph's department; Kalla's strained relationship with Joseph could be related to personality and work-based issues; and the lone reason that Joseph had more issues than his coworkers is because he interacted with Kalla more than his coworkers given his position on the scheduling committee and as a union representative. (*Id.* at 11-18.) Finally, AGH contends Kalla's conduct did not rise to the level of severe or pervasive to alter Joseph's terms and conditions of employment. (*Id.* at 18-25.)

Joseph counters, among other things, that he was subjected to unwelcome harassment and that Kalla treated him differently than non-disabled employees. (*Id.* at 8-9.) He states that "[t]he evidence demonstrates Kalla harassed Joseph because of his disability and the harassment was severe or pervasive." (*Id.* at 9-10.) Joseph also argues that Kalla's behavior was clearly related to his speech disability because multiple witnesses testified that Kalla treated him differently by allowing others to speak, saying she could not communicate with him, cutting him off, making faces, rolling her eyes, putting her hands up to get him to stop speaking, asking if he could read, and intentionally speaking slowly around him. (*Id.* at 10-13.) Joseph further counters that Kalla's treatment of him was unquestionably pervasive as he endured it for nearly four years and was severe because management knew and did nothing about it. (*Id.* at 16-20.) Lastly, he contends

that AGH's anti-harassment policy does not preclude a finding of liability against AGH because management was aware of Kalla's discriminatory behavior and chose not to act. (*Id.* at 23-24.)

As an initial matter, AGH does not appear to dispute that Joseph, who has a physical impairment that affects his ability to speak, is a qualified person with a disability. While AGH argues that Kalla did not consider Joseph to be disabled, and as such, could not have discriminated against him on that basis, Joseph contends that he told Kalla about his condition during one of their first meetings. Moreover, while Kalla alleges that she did not consider Joseph to have problems with his "speech pattern," his speech differences were noticeable to at least "some people" as AGH acknowledges. Therefore, it can reasonably be concluded that at a minimum, there are material issues of fact regarding whether she considered him to have a speech disability.

It is further undisputed that Kalla engaged in conduct towards Joseph that can fairly be characterized as harassing, negative, and inappropriate, including stopping him from speaking, belittling him, deliberately slowing her speech directed to him, interrupting him, talking over him, and saying that she did not want to speak to him. Thus, the record provides some support for a finder of fact to conclude that Joseph was subject to unwelcome harassment. Further, Joseph has proffered evidence that creates issues of material fact that after he complained to AGH about what he perceived to be unwelcome harassment due to his disability, no effective remedial action was taken.

Thus, for purposes of the pending summary judgment motion, the focus is on AGH's challenge to Joseph's ability to prove the third and fourth elements of a hostile work environment claim. That is, whether the harassment was due to Joseph's disability and whether it was sufficiently severe or pervasive to alter the conditions of his employment and to create an abusive working environment.

A. <u>Did Joseph Experience Intentional Discrimination because of his Disability?</u>

"The ADA 'does not make all harassment, or every unpleasant working environment, actionable under the law.'" *Campo v. Mid-Atl. Packaging Specialties, LLC*, __ F. Supp. 3d __, 2021 WL 4453613, at *24 (E.D. Pa. Sept. 29, 2021) (quoting *Barclay v. Amtrak*, 435 F. Supp. 2d 438, 448-49 (E.D. Pa. June. 20, 2006)). Consequently, "evidence demonstrating a poor relationship between an employer and an employee is not, by itself, sufficient to sustain a hostile work environment claim." *Campo*, 2021 WL 4453613, at *24 (quoting *Buffa v. N.J. State Dep't of Judiciary*, 56 F. App'x 571, 575 (3d Cir. 2003)). *See Perry-Hartman*, 2021 WL 3077551, at *18 (the ADA is not "a general civility code"). Rather, the ADA only affords relief where the employer's hostile conduct is *because of* a plaintiff's disability. *See id.* As such, "[a] supervisor's behavior toward a plaintiff may be offensive without being based on or because of that employee's disability." *Campo*, 2021 WL 4453613, at *24 (citing *Walton*, 168 F.3d at 667).

As the record reflects, throughout the four years that they worked together, Kalla interrupted Joseph, talked over him, belittled him, talked to him like he was a child, raised her hand to stop him from speaking, turned away from him to stop him from speaking, made faces while he was speaking, rolled her eyes at him, asked Joseph whether he could read and told him that while she could communicate with his co-workers, she could not communicate with him. At the same time, Kalla made no explicit reference to Joseph's speech impairment.

Such comments, without more, are not sufficient to survive summary judgment. *See, e.g., Mercer v. S.E. Pa. Transit Auth.*, 26 F. Supp. 3d 432, 444 (E.D. Pa. 2104) (finding that the plaintiff, who "claim[ed] to be disabled due to his diabetes, high blood pressure, and high cholesterol," had not shown that he was harassed because of his disability even though his employer frequently cursed at him, called him fat, and made fun of his weight because the plaintiff had presented no

evidence that his supervisor believed his obesity and diabetes were related); *Gresham v. Del. Dep't of Health & Soc. Servs.*, 821 F. App'x 146, 151 (3d Cir. 2020) (determining that comments such as "dumbass" and "clueless"—did not implicate the employee's race or gender and were properly disregarded by the district court as irrelevant to employee's race- and gender-based discrimination claims); *Campo*, 2021 WL 4453613, at *25 (holding that the plaintiff had not shown that he was harassed because of his disability because the plaintiff's "failure to notify others before leaving his machine" was what irked his supervisor rather than the plaintiff's need to step away to treat his diabetes). Rather, Joseph must proffer some evidence that Kalla's hostile conduct was *because of* his disability.

AGH argues that Joseph cannot sustain his burden to show that he was subject to unwanted harassment because of his disability because Joseph's coworkers experienced similar hostile behavior. Recently, in *Kendrell v. Sec'y United States Department of Defense*, the Third Circuit affirmed a district court's grant of summary judgment where the plaintiff's supervisor was found to have behaved the same "way toward everyone." *Kendrell v. Sec'y United States Dep't of Def.*, 851 F. App'x 317 (3d Cir. 2021). Unquestionably, Kalla made faces, talked over, and interrupted Joseph's coworkers as well, all of which could be characterized as harassment, and was eventually placed on a Personal Improvement Plan after another employee complained about her communication style.

Notably, while it is undisputed that her bad behavior was not limited to Joseph, his co-workers testified that Kalla treated Joseph more harshly than she did in her interactions with them. And significantly, there is some evidence to support a finding that her conduct towards Joseph was directly linked to his speech impairment, including directing him not to speak, telling him she could not understand him, interrupting him, cutting him off, deliberating slowing her own speech,

15

stating that she would communicate with a co-worker but not him and putting her hand in his face to stop him from speaking.

Clearly, Kalla and Joseph had a poor relationship for a number of reasons, and Kalla was an ineffective and unprofessional supervisor to employees other than Joseph.  As AGH points out, their fractious relationship **could be** related to personality and work-based issues.  Indeed, a fact finder could ultimately conclude that it was the combative and personality-driven work relationship between Kalla and Joseph, not his disability, that was the source of her behavior towards Joseph, and/or that her conduct towards him was not materially different than her conduct towards other employees.  However, based on the current record, and viewing the evidence in the light most favorable to Joseph, he has presented some evidence that could permit a reasonable fact finder to conclude that Kalla subjected Joseph to a hostile work environment because of his disability.

      B.      <u>Was the Discrimination Severe or Pervasive?</u>

"[A] hostile work environment [claim] requires conduct that is "severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive[.]"  *Wright v. Providence Care Ctr., LLC*, 822 F. App'x 85, 96 (3d Cir. 2020) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (3d Cir. 1993)).  Thus, this element creates two alternative theories of recovery, severe or pervasive, understanding that a single event can be so severe that it affords a basis of recovery and so too can "less severe isolated incidents . . . taken together."  *Komis v. Sec'y of the United States DOL*, 918 F.3d 289, 293-94 (3d Cir. 2019) (internal quotations omitted).

"The question of whether conduct is sufficiently 'severe or pervasive' is 'context specific.'"  *Henley v. Brandywine Hosp., LLC*, No. CV 18-4520, 2021 WL 1193277 (E.D. Pa. Mar.

30, 2021) (quoting *Castleberry v. STI Grp.*, 863 F.3d 259, 264 (3d Cir. 2017)). To be actionable, the conduct complained of must be "so severe and pervasive that it 'alters the conditions of the victim's employment' and creates an 'abusive working environment.'" *Hatch v. Franklin Cty. Jail*, No. 1:14-CV-2318, 2017 WL 6397830, at *14 (M.D. Pa. Sept. 29, 2017), *aff'd sub nom. Hatch v. Franklin Cty.*, 755 F. App'x 194 (3d Cir. 2018) (quoting *Greer v. Mondelez Global, Inc.*, 590 F. App'x 170 (3d Cir. 2014)). As a result, "[o]rdinary tribulations of the workplace, such as the sporadic use of abusive language, jokes, and occasional teasing are not enough to sustain a hostile work environment claim." *Wright v. Providence Care Ctr., LLC*, No. 2:17-CV-00747-NR, 2019 WL 4643592, at *11 (W.D. Pa. Sept. 24, 2019), *aff'd*, 822 F. App'x 85 (3d Cir. 2020) (quoting *Ballard-Carter v. Vanguard Grp.*, 703 F. App'x 149, 152 (3d Cir. 2017)). In determining "whether conduct is severe or pervasive, 'a court must consider the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Thomas v. Brandywine Hosp., LLC & Tower Health.*, No. 5:21-CV-03288, 2022 WL 507478, at *4 (E.D. Pa. Feb. 18, 2022) (quoting *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 168 (3d Cir. 2013)).

With respect to the issue of pervasive conduct, courts in this Circuit have been steadfast in finding that "general, unsubstantiated allegations that the alleged conduct occurred 'regularly' or 'all the time'" are insufficient to survive summary judgment. *Nitkin v. Main Line Health*, No. CV 20-4825-KSM, 2021 WL 4860742, at *11 (E.D. Pa. Oct. 18, 2021). *See also Collins v. Kindred Hosp. E., LLC*, Civ. A. No. 14-17, 2016 WL 4264588, at *14 (W.D. Pa. Aug. 12, 2016) (explaining that "[g]eneral claims that there were a lot of incidents [of harassment] are insufficient where the plaintiff did not testify about the specifics of the general claim"). Instead, a plaintiff must describe

17

specific instances of misconduct. *See Nitkin*, 2021 WL 4860742, at *11. Courts will look only to identified specific events when determining whether a material issue of fact exists. *See, e.g., Nitkin*, 2021 WL 486072, at *11-*12 (considering only the seven incidents that plaintiff described in her deposition testimony on summary judgment despite the fact that plaintiff had also represented that "she would be unable to recount every single time [a supervising physician]" made sexually inappropriate comments during the weekly team meetings "because there were so many'").

In his deposition testimony, Joseph described six specific events: (1) on her second day of work, Kalla squinted and puckered her lips while he was speaking; (2) in April 2016, Kalla asked Joseph whether he could read after he continued to argue with her decision to decline his vacation request; (3) in early 2017, Kalla cut him off during a department-wide meeting; (4) in September 2017, Kalla interrupted him during a meeting with Tranguch, Kalla, and Stuck; (5) Kalla asked him why he was staring at her during an October 2017 meeting; and (6) Kalla interrupted him, mocked him, and told Joseph that she could not communicate with him during a scheduling meeting. Upon the Court's independent review of the record, the Court identified two more events: (1) during an October 2017 scheduling meeting, Kalla allowed Matthews to speak but not him; and (2) during a November 2017 meeting concerning AGH's new time documenting procedures, Kalla would not allow Joseph to speak but allowed other employees to do so.

In addition to these specific examples, Joseph testified that this type of conduct occurred "all the time" during the nearly four years that Kalla was his supervisor and that it "never ceased," including during formal meetings, informal conversations, and group huddles. While these statements, without more, might be insufficiently general to support his claim, they are corroborated by his colleagues. Garcia, who worked alongside Joseph under Kalla's supervision,

observed that "any time [Joseph] talked, [Kalla] would roll her eyes and huff and puff, and she would just . . . cut him off, she would just say 'I don't understand what you're saying.'" (ECF No. 52-5 at 5.) Garcia also stated that Kalla's treatment of Joseph occurred the "all the time" that Kalla was the supervisor. (*Id.* at 6.) Likewise, Matthews described Kalla's comments and refusal to allow Joseph to speak as occurring almost every time they met.

The Court concludes that construing this evidence in the light most favorable to Joseph, as it is required to do, there are genuine issues of material fact regarding whether Kalla's conduct was pervasive. Taken as a whole, Kalla's comments and actions could be construed by the trier of fact as sufficiently pervasive to create a cloud of hostility that could interfere with the work performance of a reasonable employee.

### V.       Conclusion

Thus, because there are genuine issues of material fact regarding Joseph's claims, AGH's motion for summary judgment will be denied. An appropriate order follows.

BY THE COURT:

Dated: March 25, 2022              s/Patricia L. Dodge
                                   PATRICIA L. DODGE
                                   United States Magistrate Judge